# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| JOE THARAYIL, Derivatively on Behalf of Mohawk Industries, Inc., <br><br> Plaintiff, <br><br> v. <br><br> JEFFREY S. LORBERBAUM, BRIAN CARSON, FRANK H. BOYKIN, GLENN R. LANDAU, KAREN A. SMITH BOGART, FILIP BALCAEN, BRUCE C. BRUCKMANN, JOSEPH A. ONORATO, WILLIAM H. RUNGE III, W. CHRISTOPHER WELLBORN, and RICHARD C. ILL, <br><br> Defendants, <br><br> and <br><br> MOHAWK INDUSTRIES, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Joe Tharayil ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint, derivatively for the benefit of Nominal Defendant Mohawk Industries, Inc. ("Mohawk" or the "Company").  Plaintiff bases his allegations on personal knowledge and, as to all other matters outside his personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action, *Public Employees' Ret. Sys. of Miss. v. Mohawk Indus., Inc., et al.*, No. 4:20-cv-00005-ELR (N.D. Ga.) (filed Jan. 3, 2020) (the "Securities Class Action"); and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

## I.      INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Mohawk, against certain of its current and former officers and directors, seeking to remedy their breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.  Defendants' (defined below) actions have caused substantial financial and reputational harm to Mohawk.

2.     Mohawk is the world's largest manufacturer of conventional flooring products, like carpet, tile, stone, and wood.  The Company conducts business in three segments, with its Flooring North America segment the largest by far.  The Flooring North America segment offers floor covering product lines, including carpets, rugs, laminate, hardwood flooring, sheet vinyl, and luxury vinyl tile ("LVT").

3.     In recent years, consumers around the world have increasingly opted to use a new flooring material, LVT, as an alternative to more traditional floor coverings.  LVT is a vinyl product that is designed to look like wood, stone, or ceramic tile.  LVT is waterproof, lasts longer and is less costly to install than traditional flooring products.  LVT is predominantly manufactured in and exported from China, where manufacturers swiftly ramped up LVT production capacity and led the pace on LVT product innovation.

4.     In just five years, LVT has gone from being a relatively unknown product to comprising approximately 20.5% of all flooring sales in the U.S.  As consumer demand for LVT has grown, however, it has siphoned growth away from Mohawk's conventional flooring products—a market in which the Company has historically dominated the industry.

5.     As demand for LVT swelled, demand for Mohawk's conventional flooring products weakened, and Mohawk had to figure out how to obtain sources

of LVT in order to meet the changing demands of the marketplace.  One option was to establish relationships with reliable, cost-effective producers (most of whom were in China) that were already producing and supplying LVT.  The other option was to attempt to acquire the means to manufacture the products itself.  Mohawk's two principal competitors in the U.S., Shaw Industries ("Shaw") and Armstrong Flooring, chose the first option and quickly procured reliable sources of LVT.  Mohawk chose the second option, paying $1.2 billion to acquire a Belgium LVT manufacturer, IVC Group, with a new manufacturing plant in Dalton, Georgia (the "U.S. LVT Plant").  Defendants promised that the U.S. LVT Plant would quickly come online and enable Mohawk to meet the soaring domestic demand for LVT.

6.     A little over eighteen months after Mohawk acquired the U.S. LVT Plant, the Company was falling further and further behind its competitors in the still-burgeoning market for LVT flooring.  Shaw, for example, had increased its share of the LVT market from almost zero to nearly 30% in less than 2 years.  Mohawk, by comparison, had captured only 12% of the LVT market.

7.     Rather than admit its failures in attempting to meet domestic LVT demand through Mohawk-manufactured products, the Company offered excuses for its struggles, coupled with assurances that things would soon be better.  The Company routinely blamed "capacity constraints," falsely claiming that Mohawk

was selling all the LVT it was currently manufacturing and would be able to sell even more when it was able to increase production capacity. But the undisclosed truth was that the Company's efforts to increase domestic production were hamstrung by serious problems with production lines at the U.S. LVT Plant, which caused the lines to consistently produce huge volumes of defective "scrap" LVT that could not be sold to customers.

8.     Losing LVT market share to competitors was not Mohawk's only problem. The emergence of LVT was also eroding demand for Mohawk's conventional flooring products, especially in the Flooring North America segment. In 2017 alone, the U.S. market for LVT grew more than 17%, while the entire U.S. flooring market grew only 4%.

9.     Nevertheless, Mohawk reported that it had achieved the highest first-quarter sales in its history in the first quarter of 2017. Defendants attributed much of that success to the Flooring North America segment, which accounted for approximately 42% of Mohawk's total sales.

10.    Mohawk reported similarly spectacular results for each of the remaining quarters in 2017, again crediting Flooring North America for driving those results.

11.     Unbeknownst to investors and the market, however, the Company had achieved these results through an unsustainable scheme.  At the end of each fiscal quarter, Mohawk executives instructed employees in the Company's distribution centers to load Company trucks with millions of pounds of flooring products that were not ordered for delivery to customers until the next quarter or quarters. Employees would load the trucks on Friday as if delivery would occur on Saturday, knowing full-well that there would be no one to accept or reject the premature deliveries because the businesses were closed for deliveries on Saturdays.

12.     Mohawk would nonetheless recognize the sales revenue as soon as the fake delivery attempt occurred, *i.e.*, as soon as product was loaded on the Company's trucks.  This sales revenue recognition helped make reported sales for the current quarter appear much better than they were.  Over time the scheme became even more brazen, with many employees simply scanning the product as if it were being loaded on the truck without physically loading the product.  Employees would walk around scanning the product out on the Friday before the quarter-end and then scan it back in after the quarter closed.

13.     This "Saturday Scheme" was not the only tool Mohawk used to deceptively inflate its financial results.  The Company also had begun intentionally

overproducing products in order to drive down per-unit costs and artificially boost "operating margins"—financial metrics closely followed by analysts and investors.

14.     As a result of the foregoing, the Company's inventories ballooned, and turnover slowed.   Analysts took note, and questioned Mohawk about those worrisome trends.   The Company offered assorted explanations, from geographic expansion and new-product ramp-up, to rising raw material costs.   But those explanations were misleading and omitted material facts.   In truth, inventory was building because of the Company's intentional overproduction to exaggerate margins and the flood of unsalable LVT—caused by the rampant design flaws in the U.S. LVT Plant—that the Company refused to write down.

15.     Defendant Brian Carson ('Carson"), the former President of Flooring North America, oversaw these schemes, for which he was eventually dismissed by the Company.   Nonetheless, he was given a $1 million severance and the reason for his abrupt departure was not disclosed to analysts and investors.   Incredibly, Carson's schemes continued unabated after his departure.

16.     Beginning on April 28, 2017 and continuing through at least July 25, 2019, Defendants caused or otherwise allowed the Company to mislead investors and the market by publicly misstating or failing to disclose, among other things: (i) Mohawk's reported record quarterly sales were artificially inflated by the "Saturday

Scheme"; (ii) Mohawk's warehouses were filled with LVT that could not be sold or which was returned since much of Mohawk's U.S.-made LVT was unsalable scrap, which the Company nonetheless carried in inventory and refused to write off; and (iii) Mohawk was performing unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products.

17.     At the same time that Mohawk's stock was trading at artificially inflated prices due to this false and misleading information which was disseminated to the market, Defendants caused the Company to spend approximately ***$443 million*** to repurchase 3.7 million shares of its own stock at the artificially inflated prices.

18.     At the very same time that Mohawk was overpaying to repurchase its shares, some defendants were selling their personal Mohawk stock holdings to take advantage of the artificially inflated prices.  For example, Chief Executive Officer ("CEO") Jeffrey S. Lorberbaum ("Lorberbaum") sold 67,700 shares of his personal Mohawk holdings for proceeds of more than $12.4 million during this period, including some $2.5 million in September 2018 when he was confronted by another executive about Carson's improper schemes.

19.     When the financial consequences of the foregoing were gradually disclosed over time and the information was digested by the market, the Company's

share price dropped, causing Mohawk to lose nearly ***$9 billion*** in market capitalization.

20.     As a direct result of Defendants' unlawful course of conduct, the Company misled the investing public about its business, operations, and prospects. Consequently, Mohawk is now the subject of the Securities Class Action.  The Securities Class Action asserts claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Company and its CEO in connection with these improper public statements which artificially inflated the price of Mohawk's common stock.

21.     The Company also recently announced that it has been subpoenaed by the SEC and the United States Attorney's Office for the Northern District of Georgia concerning issues similar to those raised in the Securities Class Action.

22.     The Defendants named in this Complaint face liability to the Company for their misconduct, including, among other things: (a) failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf; (b) failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities

laws; (c) directly participating in the improper schemes and misconduct described herein; and (d) affirmatively making, allowing to be made, and/or failing to correct improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, the true reasons behind Mohawk's apparent success, as well as the Company's overall business, operations, and future prospects;

23.     Due to the Mohawk's Board of Directors' (the "Board") involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, Plaintiff brings this action to remedy the harm to Mohawk caused by Defendants' faithless actions.

## II.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

25.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this district or an individual who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of

interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.   Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because: (i) Mohawk maintains its principal place of business in this district; (ii) one or more of the Defendants resides or maintains offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iv) Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## III.   PARTIES

### A.   Plaintiff

27.   Plaintiff was a stockholder of Mohawk at the time of the wrongdoing complained of, and has continuously been a stockholder since that time, and is a current Mohawk stockholder.  Plaintiff is a citizen of the State of Washington.

28.   Plaintiff will hold Mohawk shares continuously throughout the pendency of this action.  Plaintiff brings this action derivatively in the right of and

11

for the benefit of the Company.  Plaintiff will fairly and adequately represent the interests of Mohawk and its stockholders in enforcing the rights of the Company.

**B.    Nominal Defendant**

29.    Nominal Defendant Mohawk is a manufacturer of floor covering products, including carpet, rugs, hardwood flooring, laminates, sheet laminates, tile, and ceramic.  Mohawk is a Delaware corporation with its principal executive offices located at 160 South Industrial Boulevard, Calhoun, Georgia 30701.

30.    The Company's common stock trades on the New York Stock Exchange (NYSE) under the ticker symbol "MHK."  Mohawk has over 71 million shares of common stock outstanding.

**C.    Individual Defendants**

31.    Defendant Lorberbaum is Mohawk's CEO.  He has been the CEO of the Company since January 2001 and the Chairman of its Board since May 2004. Lorberbaum is named as a defendant in the related Securities Class Action.  As of March 16, 2020, Lorberbaum beneficially owned 18,573,776 shares of Mohawk common stock, or 26.1% of the Company, which was worth more than $1.58 billion. Between 2017 and 2019, the Company paid Lorberbaum total compensation of $12,775,614 (including salary of $3,619,407, stock awards of $6,027,227, and non-equity incentive compensation of $3,081,416).  Additionally, while the price of

Mohawk stock was artificially inflated and Lorberbaum was in possession of material, adverse nonpublic information, he sold 67,700 shares of personally held Mohawk stock, between September 2017 and November 2019, at artificially inflated prices for proceeds of approximately $12.4 million.  Upon information and belief, Lorberbaum is a citizen of the State of Tennessee.

32.     Defendant Carson was Mohawk's President of Flooring North America from 2012 until he was terminated on November 12, 2018.  As Carson has publicly stated, including on his personal LinkedIn profile, he had "Full P&L [profit and loss] ownership" over Mohawk's entire North American business in his role as President of Flooring North America.  He oversaw all of Mohawk's 42 plants and 41 distribution centers in North America.  He regularly solicited customers for Mohawk, engaged in sales activities for Mohawk, and managed the Flooring North America segment of Mohawk, while also participating on Mohawk's world-wide leadership team.   Carson was paid $2,235,212 in total compensation in 2017 (including salary of $634,995, stock awards of $890,107, and non-equity incentive compensation of $697,701).  Additionally, as part of his separation agreement with the Company, Carson was paid $1,000,000; some or all of his stock awards continued to vest; he was paid for his untaken, accrued vacation; and he was provided executive outplacement services.  Mohawk identified Carson in its public

13

filings with the SEC as one of the Company's eight "executive officers," "executive employees," and "key employees" who served at the discretion of Mohawk's Board. Upon information and belief, Carson is a citizen of the State of Pennsylvania.

33.     Defendant Frank H. Boykin ("Boykin") served as Mohawk's Executive Vice President of Finance and Chief Financial Officer ("CFO") from January 2005 until April 2019, and CFO since April 2020.  Between 2017 and 2019, the Company paid Boykin total compensation of $5,853,948 (including salary of $1,444,944, stock awards of $2,581,010, and non-equity incentive compensation of $1,064,068). Additionally, while the price of Mohawk stock was artificially inflated and Boykin was in possession of material, adverse nonpublic information, he sold 3,915 shares of personally held Mohawk stock, between March 6, 2018 and March 14, 2018, at artificially inflated prices for proceeds of approximately $956,000.   Upon information and belief, Boykin is a citizen of the State of Georgia.

34.     Defendant Glenn R. Landau ("Landau") served as Mohawk's Executive Vice President and CFO from April 2019 until April 15, 2020 when he purportedly resigned "to pursue other interests."  During 2019, the Company paid Landau total compensation of $2,619,986 (including salary of $613,630, stock awards of $1,440,952, non-equity incentive compensation of $331,360, and other compensation of $234,044).  After his resignation, Landau received a payment equal

14

to nine months of his cash compensation.  Upon information and belief, defendant Landau is a citizen of Georgia.

35.     Defendant Karen A. Smith Bogart ("Bogart") has served as a director of the Company since May 2011.  Between 2017 and 2019, the Company paid Bogart total compensation of $538,809, much of which consisted of stock awards. Upon information and belief, Bogart is a citizen of the State of California.

36.     Defendant Filip Balcaen ("Balcaen") has served as a director of the Company since February 2016.  Between 2017 and 2019, the Company paid Balcaen total compensation of $508,809, much of which consisted of stock awards.  Upon information and belief, Balcaen is a citizen of Belgium.

37.     Defendant Bruce C. Bruckmann ("Bruckmann") has served as a director of the Company since October 1992.  Bruckmann serves on the Board's Audit Committee and has since at least 1996.  Between 2017 and 2019, the Company paid Bruckmann total compensation of $538,809, much of which consisted of stock awards.  Upon information and belief, Bruckmann is a citizen of the State of New York.

38.     Defendant Joseph A. Onorato ("Onorato") has served as a director of the Company since February 2008.  Onorato has chaired the Board's Audit Committee since 2011 and has been a member of the committee since 2008.

Between 2017 and 2019, the Company paid Onorato total compensation of $553,809, much of which consisted of stock awards.  Upon information and belief, Onorato is a citizen of the State of Connecticut.

39.     Defendant William H. Runge III ("Runge") has served as a director of the Company since July 2014.  Runge serves on the Board's Audit Committee and has since at least 2015.  Between 2017 and 2019, the Company paid Runge total compensation of $508,809, much of which consisted of stock awards.   Upon information and belief, Runge is a citizen of the State of Tennessee.

40.     Defendant W. Christopher Wellborn ("Wellborn") has served as a director of the Company since March 2002.  He has also served as the Company's Chief Operating Officer (COO) since November 2005 and as its President and COO since November 2009.  Between 2017 and 2019, the Company paid Wellborn total compensation of $10,888,910 (including salary of $3,127,450, stock awards of $5,208,128, and non-equity incentive compensation of $2,510,433).   Upon information and belief, Wellborn is a citizen of the State of Texas.

41.     Defendant Richard C. Ill ("Ill") served as a director of the Company between May 2011 and May 2020.  Ill also served on the Board's Audit Committee between 2011 and May 2020.  Between 2017 and 2019, the Company paid Ill total

compensation of $508,809, much of which consisted of stock awards.   Upon information and belief, Ill is a citizen of the State of Pennsylvania.

42.    Defendants Lorberbaum, Carson, Boykin, Landau, and Wellborn are collectively the "Officer Defendants."  Defendants Lorberbaum, Bogart, Balcaen, Bruckmann, Onorato, Runge, Wellborn, and Ill are collectively the "Director Defendants."  Bruckmann, Onorato, Runge, and Ill are the "Audit Committee Defendants."  Together, the Officer Defendants and the Director Defendants are sometimes referred to as "Defendants."

## IV.   DEFENDANTS' MISCONDUCT

### A.    Company Background

43.    Mohawk is the world's largest manufacturer of flooring products, historically dominating the industry in developing and distributing conventional flooring products like wood, stone, tile, ceramics, laminate, and carpet.

44.    Mohawk's customers for its conventional flooring products and LVT include retailers, distributors, builders, commercial contractors, and home centers like Floor & Décor, Home Depot, and Sherwin Williams.  Mohawk distributes the products to its Flooring North America customers from its distribution centers on Mohawk-owned trucks.

45.    Mohawk operates primarily as a duopoly in the United States conventional flooring products industry, leading most market categories along with its largest competitor, Shaw Industries, followed by a host of smaller players like Armstrong Flooring and others with under $1 billion in annual sales.

46.    The United States is by far Mohawk's largest market and the most important driver of Mohawk's financial success.   Between 2017 and 2019, the Company reported annual worldwide net sales ranging between $9.5 billion to $10 billion.   Approximately 39-42% of those sales were reported in Mohawk's largest reporting segment, the Flooring North America segment.   The Flooring North America segment includes most conventional flooring products and all LVT sold in the United States.   Mohawk reported approximately $4 billion in annual net sales for Flooring North America.

47.    The demand for LVT in the United States has skyrocketed over the last several years.   LVT offers an attractive alternative to conventional flooring products because it is designed to look like wood, stone, or ceramic tile, but offers superior performance and features.   It is made of material that is flexible and clicks into place, making it easier and therefore cheaper to install.

48.    In 2006, the resilient flooring category, only 5% of which was LVT sales, was a $1.9 billion market that captured only 7.5% of the total U.S. flooring

market.  Nearly 80% of it was manufactured in the United States.  By 2016, as a result of growing demand for LVT, the resilient category surged to a $3.4 billion market, capturing 15% of the total U.S. flooring market, with 59% of the category's sales from LVT.  By 2017, LVT helped make resilient flooring the largest hard surface flooring category in the U.S.  While demand was soaring, LVT was increasingly produced overseas, with domestic production dropping to 41%.

49.    In contrast to its vast success in selling conventional flooring products, Mohawk struggled to capture market share for LVT.  When demand for LVT began to boom, Mohawk's competitors, Shaw and Armstrong, moved quickly to establish reliable and cost-effective manufacturing sources for LVT internationally.  Mohawk went a different route, choosing to purchase a domestic LVT manufacturer.

50.    In June 2015, Mohawk spent $1.2 billion to purchase IVC Group, an LVT manufacturer with an LVT plant in Belgium and the U.S. LVT Plant.  When Mohawk's acquisition of IVC was announced, defendant Carson said in a June 17, 2015 interview on FloorDaily.net that Mohawk would bring its superior distribution channel and "logistics capabilities" to bolster IVC's LVT manufacturing expertise.  Carson championed the combination of IVC's superior manufacturing capabilities and Mohawk's world class distribution as Mohawk's golden ticket to LVT market share.

51.     Nonetheless, Mohawk began falling further behind its competitors, who had aggressively sourced cost-efficient LVT.  Shaw, for example—which had zero market share before entering the LVT market at the end of 2015—shot to the top spot in 2017, capturing almost 30% of U.S. LVT sales.  Armstrong, whose size pales in comparison to Mohawk and Shaw, had grabbed over 13% of domestic LVT sales.

52.     Mohawk, the world's largest conventional flooring company, had meanwhile captured only 12% of LVT sales.  Mohawk blamed its struggles to grow its LVT business on a lack of production capacity, assuring investors that the new capacity would lead to even greater sales.

53.     Nonetheless, beginning in April 2017, Mohawk repeatedly met analyst expectations while reporting record sales and record margins.  In doing so, Mohawk assured investors that it achieved its "record sales" and "record margins" through legitimate, proper means.

**B.      The Company's "Saturday Scheme" to Inflate Sales and Undisclosed Reasons for Its Ballooning Inventory**

54.     While Mohawk was reporting record sales quarter after quarter and driving up its stock price, it concealed that these results were achieved through an improper scheme.  At the end of each quarter the scheme was executed, Mohawk and its top executives instructed the Company's distribution centers to load their trucks with all items ordered by customers at any time—even though the agreed-

upon delivery dates were in future quarters.  As soon as the items were loaded on its trucks, Mohawk would auto-generate invoices for customers' accounts and recognize a "sale" in the current quarter, even though delivery of the product was not completed.

55.    Mohawk chose the last Saturday of each quarter to make these purported "deliveries" precisely because customers were not open to reject the unwanted delivery on Saturdays.

56.    The Saturday Scheme involved millions of pounds of product, customers of all sizes, and every product available in the warehouses, including both conventional flooring products and LVT.  Mohawk employed the scheme across the country.  The spike in orders invoiced on the final day of the quarter as a result of this scheme was reflected in reports which were sent to Mohawk's senior leadership on a daily basis.  The resulting returns the following quarter were also reflected in reports provided to senior management.

57.    The Company's scheme allowed Mohawk to recognize these failed "delivery attempts" as "sales" dollars in the current quarter even though the product never changed hands to a customer, in violation of generally accepted accounting principles (GAAP) and Mohawk's stated revenue-recognition policies.

58.     Under GAAP, sales revenue may only be recognized when "delivery has occurred." In purported accordance with this mandate, Mohawk told the market that it recognized sales revenue only after the product was in the hands of customers.

59.     The Company's utilization of the Saturday Scheme further violated Mohawk's publicly stated policies on "ethics" and "corporate conduct." In the Company's published "Standards of Conduct and Ethics for Employees, Officers, and Directors of Mohawk Industries, Inc.," Mohawk assured investors that its officers would "not authorize or permit the use of . . . an accounting treatment if the effect is to distort or conceal Mohawk's true financial condition." Mohawk further represented that its executives would not "distort or conceal Mohawk's true financial condition," even if a "particular accounting treatment for one or more of Mohawk's operations may be permitted under applicable accounting standards."

60.     In addition to misleading investors about their "record sales," Mohawk also misrepresented the true reasons why the Company's inventories were growing, and its inventory turnover was slowing.

61.     The true, undisclosed reasons for Mohawk's excessive inventory levels were twofold. *First*, Mohawk improperly carried in its reported inventory enormous quantities of domestically produced unsalable "scrap" LVT, even though the scrap was coded in the Company's computers as not to be shipped to customers. Carrying

that scrap LVT in inventory—rather than writing it down as GAAP requires—bloated the Company's inventory, while allowing the Company to hide from investors the rampant quality-control problems plaguing the Company's attempts to compete in the burgeoning LVT market.  It also led to under-reporting of the Company's cost of sales and, as a result, inflated the Company's margins and net income.

62.    *Second*, to further inflate profits and margins, defendant Carson ordered Mohawk's factories to perform overly long production runs that caused production to far outstrip demand.  By overproducing product, Mohawk was able to artificially drive down the cost to manufacture each product by spreading the Company's fixed manufacturing costs across more products.  The effect was to artificially reduce the Company's cost of sales, which in turn inflated the Company's margins.  The downside of this scheme was that because of the overproduction, inventory levels grew, and the time needed to turn that inventory lengthened.

63.    Taken together, Mohawk's inability to sell a large percentage of its domestically produced LVT (which Mohawk retained in inventories on its balance sheet) and Mohawk's continual overproduction of LVT and other products to artificially inflate margins were the real, undisclosed culprits fueling the Company's worsening inventory metrics.

23

### C.   Mohawk Fires Its President of Flooring North America

64.   On November 13, 2018, Mohawk announced that "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests" and that Paul De Cock had been promoted to take his place.

65.   Two months earlier, in September 2018, defendant Lorberbaum had been confronted by another member of Mohawk's executive leadership team concerning defendant Carson's various schemes (*e.g.*, the "Saturday Scheme," scrap carried as inventory, and the overly long production runs) who told defendant Lorberbaum point blank that Carson was cooking the books.  In response, defendant Lorberbaum launched an investigation into Carson's schemes which included interviewing everyone on the executive leadership team.  The Company's CFO, defendant Boykin, also participated in the investigation.   The investigation ultimately led to the decision to terminate defendant Carson's employment.

66.   On September 14, 2018, about the same time he was confronted by his fellow executive, defendant Lorberbaum sold 13,400 shares of his personally held Mohawk shares, realizing proceeds of $2.5 million.  Defendant Lorberbaum's most recent sale of Mohawk shares had been more than one year earlier.

67.     In the end, defendant Lorberbaum and Mohawk decided to sweep Carson's misconduct under the rug.  To ensure his silence, defendant Carson was given a substantial severance package to leave quietly, receiving an entire year's compensation in an all-cash payment of $1 million, with the express requirement that he never publicly disclose any confidential information from his time at Mohawk and that he "cooperate with Mohawk's representatives in connection with any actual or threatened litigation and/or administrative proceeding(s) in which [he] is potentially a witness."

68.     Not only did Mohawk continue to conceal the fraudulent practices and fail to correct its misleading financial statements upon which investors relied, but it also took no corrective action to stop the widespread improper schemes throughout the Company.   And the price of Mohawk's publicly traded stock remained artificially inflated.

### D.     The Board Approves And Executes Its Share Repurchase Plan

69.     Just weeks after the September 2018 meeting about defendant Carson's schemes, on October 25, 2018, the Company announced that its Board approved a new share repurchase program authorizing the Company to repurchase up to $500 million in shares of its common stock.

70.     Thereafter, Defendants caused Mohawk to repurchase Company shares under the plan at prices artificially inflated by their misconduct and the false and misleading statements made to investors and the market.  In total, between October 25, 2018 and March 28, 2020, Mohawk made the following repurchases totaling 3.7 million of its own shares at artificially inflated prices, for which it expended approximately $443 million.

| Time Period | Shares Repurchased | Average Price Paid | Total Amount Paid |
|---|---|---|---|
| 10/1/18 -11/2/18 | 500,000 | $117.99 | $58,995,000 |
| 11/5/18 – 11/30/18 | 400,000 | $122.28 | $48,912,000 |
| 12/3/18 – 12/31/18 | 1,400,000 | $118.27 | $165,578,000 |
| 6/30/19 – 8/3/19 | 400,000 | $125.36 | $50,144,000 |
| 9/1/19 – 9/28/19 | 200,000 | 121.65 | $24,330,000 |
| 9/30/19 – 11/1/19 | 200,000 | $119.76 | $23,952,000 |
| 2/2/20 – 2/29/20 | 200,000 | $122.70 | $24,540,000 |
| 3/1/20 – 3/28/20 | 400,000 | $116.82 | $46,728,000 |
| *Total* | *3,700,000* | | *$443,179,000* |

**E.      Defendants Made or Allowed Improper Public Statements**

71.     Beginning in April 2017 at the latest, Defendants made or allowed to be made, and failed to correct, untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Such statements and omissions were made in violation of § 10(b) of the Exchange Act and Rule 10b- 5.

72.     Specifically, between April 28, 2017 and July 25, 2019, Defendants caused Mohawk to misrepresent and fail to disclose to investors that, among other things:

> (a)     Mohawk misleadingly reported record quarterly sales and attributed them to specific, legitimate factors, without disclosing that the "Saturday Scheme"—which was undertaken in violation of GAAP and Mohawk's stated revenue recognition practices—had artificially inflated its reported sales;

> (b)     Mohawk misleadingly told investors that it was "selling all of [LVT] we could have" and was therefore "capacity constrained," and made similar representations, without disclosing that, in reality Mohawk's warehouses were filled with its domestically produced "scrap" LVT that could not be sold or which was returned because of product defects;

> (c)     Mohawk misleadingly told investors that its rising inventory and increasing days-in-inventory were attributable to factors like inflation and geographic expansion, without disclosing that its inventory was rising and turnover slowing because its warehouses were filled with its domestically produced "scrap"

LVT that could not be sold or which was returned because of product defects, and the Company performed unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products;

(d)     Mohawk misleadingly told investors that Mohawk's LVT product had "superior design and performance" and was "being well accepted across all channels" when, in reality, Mohawk's warehouses were filled with its domestically produced "scrap" LVT that could not be sold or which was returned because of product defects; and

(e)     Mohawk misleadingly reported record quarterly margins and attributed them to specific, legitimate factors, without disclosing that, in reality, Mohawk achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers.

**First Quarter 2017 False and Misleading Statements**

73.     On April 28, 2017, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the first quarter of 2017 (the "First Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day before (the "First Quarter 2017 Press Release").   During the First Quarter 2017 Investor Call, defendants Lorberbaum and Boykin spoke on behalf of Mohawk.

74.     During the First Quarter 2017 Investor Call and in the First Quarter 2017 Press Release, Mohawk touted its "record" sales, with defendant Lorberbaum

beginning the First Quarter 2017 Investor Call by stating that "[i]n the first quarter, Mohawk sales rose approximately 4% . . . to a first quarter record of $2.2 billion." In both the First Quarter 2017 Investor Call and First Quarter 2017 Press Release, defendant Lorberbaum also reported that "[d]uring the quarter, sales in our Flooring North America segment increased 4%."

75.     In its May 5, 2017 quarterly report for the period ending May 5, 2017 (the "First Quarter 2017 10-Q"), signed by defendants Lorberbaum and Boykin, and filed with the SEC, Mohawk also reported that "[n]et sales for the three months ended April 1, 2017 were $2,220.6 million."  The Company additionally reported in the First Quarter 2017 10-Q that Flooring North America's "[n]et sales increased $33.1 million, or 3.7%, to $939.5 million."

76.     Defendants' statements identified in paragraphs 74 and 75 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

77.     In the First Quarter 2017 10-Q, Mohawk also misled investors by attributing the Company's "record" net sales to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $50 million, or 2%, and the favorable net impact of price and product mix of approximately $16 million."  It similarly attributed the net sales in the Flooring North America segment solely to legitimate business factors, reporting that

"[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $28 million, or 3%, and the favorable net impact of price and product mix of approximately $5 million."   During First Quarter 2017 Investor Call, defendant Lorberbaum further misleadingly attributed the Company's record sales to "doing the right things to make the business grow" and using "the same strategy [they had] been using" to provide results over the previous 5 years.

78.   Defendants' statements identified in paragraph 77 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

79.   During the First Quarter 2017 Investor Call, defendant Lorberbaum also misled investors by attributing the Company's "first quarter record" operating margin of 12.4%, up 110 basis points over the prior year, to legitimate business factors, including "volume, mix and productivity."   defendant Boykin likewise attributed the "improvement" in gross margin of 30.8%, which was up 110 basis points, to "productivity of $36 million, volume of $14 million and price/mix of $10 million."   Defendant Lorberbaum further attributed the rise in margins to capital investments, reporting that "the capital investments are to increase our product innovation, which allows us to make more differentiated products, which allows us to participate in higher-margin premium categories."

80.    Boykin told investors during the First Quarter 2017 Investor Call that the "improvement" in the Flooring North America segment's operating income margin of 10.1%, up 140 basis points, "was supported by productivity of $13 million and volume of $5 million."  Defendants also touted particular products that improved the margins in Flooring North America, with defendant Lorberbaum stating that "[t]he continued improvement of our LVT manufacturing process is increasing our capacity and margins."  When asked "what role carpet played in the margin in the quarter," defendant Lorberbaum said, "it would be hard to drive the margins up dramatically . . . and leave out such a large part of our business."

81.    Defendants' statements identified in paragraphs 79 and 80 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a) & (e).

82.    During the First Quarter 2017 Investor Call, defendant Lorberbaum further stated that, "[w]ith their superior design and performance, our flexible, rigid and commercial LVT collections are being well accepted across all channels."  That statement was false, misleading, and omitted material facts for the reasons set forth in paragraph 72(d).

83.    During the First Quarter 2017 Investor Call, defendant Boykin also stated that the Company's rising inventories and slow inventory turnover were

31

attributable to "geographic expansion and product growth." That statement was false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

### **Second Quarter 2017 False and Misleading Statements**

84.    On July 28, 2017, Mohawk hosted a conference call with investors to discuss its financial results for the second quarter of 2017 (the "Second Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Second Quarter 2017 Press Release"). During the Second Quarter 2017 Investor Call, defendants Lorberbaum, Boykin, and Wellborn, spoke on behalf of Mohawk.

85.    During the Second Quarter 2017 Investor Call and in the Second Quarter 2017 Press Release, Mohawk touted its "record" sales, with defendant Lorberbaum stating during the Second Quarter 2017 Investor Call that "[i]n the second quarter, Mohawk's performance continued at a record level, generating the highest sales . . . in the company's history" and that "[o]ur businesses continued their exceptional execution, with sales growth of 6% as reported and 8% on a constant days and currency basis." Defendant Boykin further stated during the Second Quarter 2017 Investor Call that "net sales of $2,453,000,000 were an all-time new record, growing 6% as reported and 8% using constant days and foreign exchange."

Likewise, the Second Quarter 2017 Press Release quoted defendant Lorberbaum as stating that "[d]uring the period, Mohawk delivered record results, generating the highest sales . . . in the company's history."  In addition, in both the Second Quarter 2017 Investor Call and Second Quarter 2017 Press Release, defendant Lorberbaum highlighted that "[d]uring the quarter, our Flooring North America Segment's sales increased 6%[.]"

86.     Mohawk reported these same sales figures in its August 4, 2017 quarterly report for the second quarter period ending July 1, 2017 (the "Second Quarter 2017 10-Q"), signed by defendants Lorberbaum and Boykin, and filed with the SEC, which reported that "[n]et sales for the three months ended July 1, 2017 were $2,453.0 million, reflecting an increase of $142.7 million, or 6.2%, from the $2,310.3 million reported for the three months ended July 2, 2016."  The Second Quarter 2017 10-Q further reported that, for Flooring North America, "[n]et sales increased $ 59.6 million, or 6.1%, to $1,040.3 million for the three months ended July 1, 2017, compared to $980.7 million for the three months ended July 2, 2016."

87.     Defendants' statements identified in paragraphs 85 & 86 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

88.     In the Second Quarter 2017 10-Q, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that

"[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $109 million, or 5%, . . . and sales volume attributable to acquisitions of approximately $48 million" and "[a]lso contributing to the increase in sales was the favorable net impact of price and product mix[.]"  It similarly attributed the increase in net sales in the Flooring North America segment solely to legitimate business factors, reporting that the "increase [in sales] was primarily attributable to higher sales volume of approximately $39 million, or 4%, and the favorable net impact of price and product mix of approximately $21 million, or 2%."

89.    Defendants' statements identified in paragraph 88 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

90.    During the Second Quarter 2017 Investor Call, defendant Boykin also misled investors by attributing the 60 basis-point year-over-year "improvement" in the Company's operating margin to "$20 million of price/mix and $12 million of productivity[.]"

91.    Defendants' statements identified in paragraph 90 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(e).

92.    During the Second Quarter 2017 Investor Call, defendant Boykin also misleadingly stated that the Company's rising inventory and slow inventory turnover were attributable to "raw material inflation and more sourced product needed to

support our LVT, ceramic and countertop businesses."  Specifically, defendant Boykin stated that "[o]ur inventories were $1,866,000,000, with the inventory days at 109 days for the year.  It increased from 105 last year due to raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses."

93.    During the Second Quarter 2017 Investor Call, analyst Laura Champine of Roe Equity Research raised concerns that Mohawk's "inventory growth in the quarter was pretty significant."  In response, defendant Lorberbaum attributed the rise in inventory to "chasing demand," explaining:

> It's really made up of a few pieces.  First is right.  As the material costs go up, all of that flows into inventory immediately as the prices go up. The second is that as we're building our businesses in different places, we're importing products for LVT, ceramic and countertops, so those inventories are going up.  And then finally, the U.S. economy was not quite as robust as we were expecting.

94.    Defendants' statements identified in paragraphs 92 and 93 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

**Third Quarter 2017 False and Misleading Statements**

95.    On October 27, 2017, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the third quarter of 2017 (the "Third Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the

"Third Quarter 2017 Press Release").  During the Third Quarter 2017 Investor Call, defendants Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

96.     During the Third Quarter 2017 Investor Call and in the Third Quarter 2017 Press Release, Mohawk once again touted its "record" results, with Lorberbaum stating that "Mohawk delivered record earnings and [earning per share ("EPS")] with sales growing approximately 7%."  In the Third Quarter 2017 Press Release, the Company further reported that "[n]et sales for the third quarter of 2017 were $2.4 billion, up 7% in the quarter and 5% on a constant days and currency basis."  In the Third Quarter 2017 Press Release, Lorberbaum stated that, "[d]uring the quarter, our Flooring North America segment's sales increased 2% as reported."

97.     Mohawk reported these same sales figures in its November 3, 2017 quarterly report for the third quarter period ending September 30, 2017 (the "Third Quarter 2017 10-Q"), signed by defendants Lorberbaum and Boykin, and filed with the SEC, reporting that "[n]et sales for the three months ended September 30, 2017 were $2,448.5 million, reflecting an increase of $154.4 million, or 6.7%."  The Third Quarter 2017 10-Q further stated that Flooring North America's "[n]et sales increased $23.2 million, or 2.3%, to $1,031.8 million for the three months ended September 30, 2017."

98.   Defendants' statements identified in paragraphs 96 and 97 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

99.   Mohawk also misled investors in the Third Quarter 2017 10-Q by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $42 million, or 2%" and "the favorable net impact of price and product mix of approximately $73 million, or 3%, and the net impact of favorable foreign exchange rates of approximately $40 million, or 2%."   It similarly misleadingly attributed the increase in net sales in the critical Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to the favorable net impact of price and product mix of approximately $41 million, or 4%."

100.   Defendants' statements identified in paragraph 99 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

101.   During the Third Quarter 2017 Investor Call, Boykin also misled investors by attributing the Company's improved gross margin of 32% to "$63 million of price/mix and $40 million of productivity" and the Company's improved "operating margin" of 16.2% to "$62 million of price/mix and $49 million of productivity."   Defendant Lorberbaum likewise told investors in the Third Quarter

2017 Press Release that for the Flooring North America segment, "[o]ur new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our cost."

102.   Defendants' statements identified in paragraph 101 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(e).

103.   During the Third Quarter 2017 Investor Call, defendant Lorberbaum told investors that "[w]e expect higher sales with the relief of some of our capacity constraints, enabling us to expand our market position."   Defendant Wellborn likewise stated that for Flooring North America, "[c]apacity limitations in laminate, LVT and some residential carpet categories constrained our sales[.]"

104.   When an analyst asked defendant Lorberbaum during Third Quarter 2017 Investor Call what "production limitations" meant for the Flooring North America hard surfaces, he explained that it meant Mohawk was selling all of the product it could produce: "[i]t means that we have sold all of the laminate that we could make without putting in new capacity, which is just getting started up . . . . With LVT, we increased the capacity of our LVT through productivity initiatives, so we were selling all of it we could have." Lorberbaum once more confirmed that "we had constraints in laminate, LVT and some of our residential carpet" in Flooring North America.

105.   Defendants' statements identified in paragraphs 103 and 104 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(b).

106.   During the Third Quarter 2017 Investor Call, Boykin also represented that the Company's rising inventory and slowing inventory turnover were attributable to "raw material inflation and source product growth[.]"  Specifically, defendant Boykin stated that "[o]ur inventories ended the quarter at $1,911,000,000. We had 112 days of inventory on hand, with raw material inflation and source product growth impacting the days."

107.   Defendants' statements identified in paragraph 106 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

**Fourth Quarter 2017 False and Misleading Statements**

108.   On February 9, 2018, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the fourth quarter of 2017 (the "Fourth Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Fourth Quarter 2017 Press Release").  During the Fourth Quarter 2017 Investor Call, defendants Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

109.   During the Fourth Quarter 2017 Investor Call, Mohawk touted its "record" sales, with defendant Lorberbaum reporting that Mohawk "recorded our best results for the period with sales of $2.4 billion, up 8.5% over the prior year."  In the Fourth Quarter 2017 Press Release, defendant Lorberbaum further told investors that "[d]uring the quarter, [Mohawk's] Flooring North America Segment's sales increased 3% as reported."

110.   Mohawk reported these same sales figures in its February 28, 2018 annual report for the fourth quarter period and full year 2017 (the "2017 10-K"), signed by defendants Lorberbaum, Boykin, Balcaen, Bruckmann, Ill, Onorato, Runge, Bogart, and Wellborn, and filed with the SEC, which reported that "[n]et sales for 2017 were $9,491.3 million, reflecting an increase of $532.2 million, or 5.9%."  The 2017 10-K also reported that, for Flooring North America, "[n]et sales increased $145.1 million, or 3.8%, to $4,010.9 million for 2017, compared to $3,865.7 million for 2016."

111.   Defendants' statements identified in paragraphs 109 and 110 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

112.   In the 2017 10-K, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase

[in sales] was primarily attributable to higher sales volume of approximately $245 million, or 3%, . . . the favorable net impact of price and product mix of approximately $218 million, or 2%, and the favorable impact of foreign exchange rates of approximately $69 million, or 1%."   It also misleadingly attributed Mohawk's net sales in the Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volumes of approximately $39 million, or 1%, and the favorable net impact of price and product mix of $105 million, or 3%."

113.   Defendant Lorberbaum again misleadingly attributed Mohawk's increase in sales solely to legitimate business factors during the Fourth Quarter 2017 Investor Call.   Specifically, defendant Lorberbaum stated on the Fourth Quarter 2017 Investor Call that "[o]ver the past 3 years, our strategies of adding new products, increasing our capacities and acquiring new businesses have led to an expanded earnings . . . . Our 2017 results reflect the impact of these strategies . . . ." He further attributed the success for 2017 to "the unique strategy that combined the best features of a large, well-run public company, a private acquisition firm and a venture capital group."  In response to an analyst inquiry about the "tangible drivers" for Mohawk's business, he stated that:

> Let's see. I think the biggest piece, which wasn't a surprise, we knew there was going to be some pull-forward of sales due to price increases.

There's the balancing of the pricing versus the cost and the flow-through and how they actually show up in the fourth quarter. There's the FX rates that changed on us, out of our control within there. In general, the business levels were about what we thought they'd be when we went into them. And we think we have reasonable estimates for the first quarter, given all that's going on.

114. Defendants' statements identified in paragraphs 112 and 113 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a)

115. During the Fourth Quarter 2017 Investor Call, defendant Boykin also misled investors by attributing the Company's improvement in gross margin of 31.8% to "price/mix and productivity." Defendant Boykin likewise told investors that the Flooring North America segment's operating margin of 16.7%, up 160 basis points, "improved" as a result of "positive price/mix of $21 million and productivity of $22 million[.]"

116. Defendants' statements identified in paragraph 115 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(e).

117. During the Fourth Quarter 2017 Investor Call, defendant Boykin also stated that the Company's rising inventory and slowing inventory turnover were attributable to "higher raw material cost, ramp-up of new products and backwards integration." Specifically, defendant Boykin stated that "[o]ur inventories were

$1,949,000,000 with inventory days at 119 days. Inventories have been impacted by higher raw material cost, ramp-up of new products and backwards integration."

118. Defendants' statements identified in paragraph 117 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

**First Quarter 2018 False and Misleading Statements**

119. In April 27, 2018, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the first quarter of 2018 (the "First Quarter 2018 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "First Quarter 2018 Press Release"). During the First Quarter 2018 Investor Call, defendants Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

120. In the First Quarter 2018 Press Release, Mohawk stated that "[n]et sales for the first quarter of 2018 were $2.4 billion, up 9% in the quarter and 4% on a constant currency basis." Defendant Lorberbaum repeated these sales numbers during the First Quarter 2018 Investor Call, stating that "[i]n the first quarter, we generated sales of $2.4 billion, up 9% over the prior year[.]" In the First Quarter 2018 Press Release, defendant Lorberbaum also told investors that "[d]uring the quarter, our Flooring North America Segment's sales increased 1%." Defendant Boykin also asserted during the First Quarter 2018 Investor Call that "[i]n the

43

Flooring North America segment, sales were $950 million compared to $939 million in 2017 with good growth in residential carpet and LVT."

121.   Mohawk reported these same sales figures in its May 4, 2018 quarterly report for the first quarter period ending March 31, 2018 (the "First Quarter 2018 10-Q"), signed by defendants Lorberbaum and Boykin, and filed with the SEC, which reported that "[n]et sales for the three months ended March 31, 2018 were $2,412.2 million, reflecting an increase of $191.6 million, or 8.6%." The Company further reported that, for Flooring North America "[n]et sales increased $10.9 million, or 1.2%, to $950.4 million."

122.   In the First Quarter 2018 10-Q, the Company also misled investors by attributing its quarterly net sales solely to legitimate business factors, stating that "[t]he increase [in sales] was attributable to higher sales volume of approximately $57 million, or 2%" and "[a]lso contributing to the increase in sales was the net impact of favorable foreign exchange rates of approximately $99 million, or 4% and the favorable net impact of price and product mix of approximately $36 million, or 2%." It also misleadingly attributed Mohawk's quarterly net sales in its critical Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase of $11 million was primarily attributable to the favorable net impact of price and product mix and higher sales volume."

123.   Defendants' statements identified in paragraphs 120, 121 and 122 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

124.   During the First Quarter 2018 Investor Call, Defendants also represented that the Company's rising inventories and slow inventory turnover were attributable to "increasing inflation and our backwards integration."  Specifically, defendant Boykin stated, "[i]nventories were $2,045,000,000 with inventory days at 116 days, which improved over the fourth quarter.  Inventory turns continue to be impacted by increasing inflation and our backwards integration."

125.   Defendants' statements identified in paragraph 124 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

**Second Quarter 2018 False and Misleading Statements**

126.   On July 26, 2018, Mohawk hosted a conference call with investors to discuss its financial results for the second quarter of 2018 (the "Second Quarter 2018 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Second Quarter 2018 Press Release").  During the Second Quarter 2018 Investor Call, defendants Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

45

127.   On the Second Quarter 2018 Investor Call, defendant Lorberbaum stated that "[d]uring the period, our U.S. LVT sales growth was limited by capacity constraints."

128.   During the Second Quarter 2018 Investor Call, Boykin further stated that the Company's rising inventories and slow inventory turnover were attributable to "inflation negatively impact[ing] the [inventory days] calculation."

129.   Defendants' statements identified in paragraph 127 and 128 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(b).

**Third Quarter 2018 False and Misleading Statements**

130.   On October 26, 2018, Mohawk hosted a conference call with investors to discuss its financial results for the third quarter of 2018 (the "Third Quarter 2018 Investor Call").   During the Third Quarter 2018 Investor Call, defendants Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

131.   During the Third Quarter 2018 Investor Call, an analyst at Evercore ISI asked defendant Lorberbaum to "help us understand or break down what we see in the overall inventory number because it still seems kind of high."   In response, defendant Lorberbaum attributed the Company's level of inventory to "raw material inflation," stating that the inventory turns got "worse because the raw materials have

increased, and it's showing up in the inventory dollars, in addition to having nothing to do with the units as the prices go up."

132.   During that same investor call, defendant Boykin also stated that the Company's rising inventories and slow inventory turnover were attributable to "inflation and backwards integration."

133.   Defendants' statements identified in paragraph 131 and 132 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(b).

**Fourth Quarter 2018 False and Misleading Statements**

134.   On February 8, 2019, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the fourth quarter of 2018 (the "Fourth Quarter 2018 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Fourth Quarter 2018 Press Release").

135.   During the Fourth Quarter 2018 Investor Call, Boykin stated that "[n]et sales for the quarter were $2,449,000,000 and grew 3% as reported, with the legacy business up almost 1% on a constant exchange rate basis."  Defendant Lorberbaum repeated these sales numbers during the Fourth Quarter 2018 Investor Call, stating that "[w]e generated sales of $2.4 billion, up 3% as reported or 5% on a constant currency."  In the Fourth Quarter 2018 Press Release, Mohawk also told investors

that "[n]et sales for the fourth quarter of 2018 were $2.45 billion, up 3% in the quarter and 5% on a constant currency basis."  Defendant Wellborn also asserted during the Fourth Quarter 2018 Investor Call that "[i]n the fourth quarter, our Flooring North America segment sales were approximately $974 million, decreasing about 3%[.]"

136.   Mohawk reported these same sales figures in its February 28, 2019 annual report for the fiscal year ending December 31, 2018 (the "2018 10-K"), signed by defendants Lorberbaum, Boykin, Balcaen, Bruckmann, Ill, Onorato, Runge, Bogart, and Wellborn,  and filed with the SEC, which reported that "[n]et sales for 2018 were $9,983.6 million, reflecting an increase of $492.3 million, or 5.2%, from the $9,491.3 million reported for 2017."  The Company further reported that, for Flooring North America "[n]et sales increased $18.3 million, or 0.5%, to $4,029.1 million for 2018, compared to $4,010.9 million for 2017."

137.   In the 2018 10-K, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to higher sales volume of approximately $297 million, or 3%, which includes sales volumes attributable to acquisitions of approximately $229 million and legacy sales volumes of approximately $68 million, the favorable net impact of price and product mix of approximately $111 million, or 1%, and the

favorable net impact of foreign exchange rates of approximately $85 million, or 1%." It also misleadingly attributed Mohawk's net sales in the Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to the favorable net impact of price and product mix of $51 million, or 1%."

138. Defendants' statements identified in paragraphs 135, 136 and 137 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

139. During the Fourth Quarter 2018 Investor Call, Boykin attempted to downplay the Company's mounting inventory and rising inventory days (*i.e.*, days in inventory or DII), claiming that "[o]ur inventory was up $340 million from the fourth quarter of last year, with 70% of the increase from new businesses and acquisitions and 30% of the increase from Chinese prebuy and inflation."

140. When analysts continued to inquire about rising inventories on the Fourth Quarter 2018 Investor Call, defendant Lorberbaum comforted investors about the purported reasons for the increased revenues, including in the following exchange:

> Analyst (Michael Glaser Dahl, RBC Capital Markets, LLC): The first question, I wanted to go back to the discussion around the inventory. And notwithstanding the uncertainty about whether or not tariffs go into effect at 25% in March, just focused specifically at what's played out

over the last couple of months. Yes, you mentioned the Chinese prebuy. Part of that is around the Lunar New Year. Part, presumably for you guys and also maybe your competitors, is really that—to also getting that in ahead of the tariffs. Can you just discuss what you're seeing in terms of both competitor inventory levels and channel inventory levels from your customers in LVT?

Lorberbaum: I can't speak for my competitors because I have no idea. But we are raising the inventories for all the reasons you just went through. In some cases, we're buying it ahead because of the pricing. In some cases, we're buying it ahead because of the increases. And in some cases, we're buying it ahead to expand our business and footprint and brands we're selling under in each cases. So it's all of the above. I would imagine the rest of the world is doing the same thing.

141.    During the Fourth Quarter 2018 Investor Call, analysts also inquired about rising LVT inventories.  In response, defendant Lorberbaum assured investors about the purported reasons for the increased LVT inventories, including in the following exchange:

Analyst (Stephen Kim, Evercore ISI Institutional Equities): So then my second question relates to inventory. I think you mentioned that you're sort of building -- the stuff that you're making in LVT, the new LVT line is going into inventory right now . . . .

Lorberbaum: First is that, I assume you know that the Chinese have a down period in the first of the year, so you have to prebuy ahead of it. The second is we are expecting our sales to go up, so we're building inventories for those product categories before we have any sales. And you have to build enough so you can satisfy the customers. Third is the inventory is also going into all these new businesses we go keep talking about. When you start them up, you put in all the raw materials, the inventories and you're building new products before the sales in those too, so the inventories are all there.

142.   Defendants' statements identified in paragraphs 139, 140 and 141 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

**First Quarter 2019 False and Misleading Statements**

143.   On April 26, 2019, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the first quarter of 2019 (the "First Quarter 2019 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed on April 25, 2019 (the "First Quarter 2019 Press Release").   During the First Quarter 2019 Investor Call, defendants Lorberbaum, Boykin (who was now a Senior Consultant), Wellborn, and Mohawk's new CFO, Landau, spoke on behalf of Mohawk.

144.   During the First Quarter 2019 Investor Call, defendant Lorberbaum stated that "[w]e delivered sales of $2.4 billion, up 1% as reported and up 6% on a constant exchange and days basis."   In the First Quarter 2019 Press Release, Mohawk also told investors that "[n]et sales for the first quarter of 2019 were $2.44 billion, up 1% in the quarter and 6% on a constant currency and days basis."   Landau also asserted during the First Quarter 2019 Investor Call that "[i]n the Flooring North America segment, sales of $922 million decreased year-over-year by 3% on an as-reported basis or 1.4% on a daily rate."

145.   Mohawk reported these same sales figures in its May 3, 2019 quarterly report for the quarter ending March 30, 2019 (the "First Quarter 2019 10-Q"), signed by defendants Lorberbaum and Landau, and filed with the SEC, which reported that "[n]et sales for the three months ended March 30, 2019 were $2,442.5 million, reflecting an increase of $30.3 million, or 1.3%, from the $2,412.2 million reported for the three months ended March 31, 2018."  The Company further reported that, for Flooring North America "[n]et sales decreased $28.4 million, or 3.0%, to $922.0 million for the three months ended March 30, 2019, compared to $950.4 million for the three months ended March 31, 2018."

146.   In the First Quarter 2019 10-Q, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to higher sales volume of approximately $100 million, or 4.1% which includes sales from acquisitions of approximately $120 million, higher legacy sales volume of approximately $16 million."

147.   Defendants' statements identified in paragraphs 144, 145 and 146 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(a).

148.   During the First Quarter 2019 Investor Call, Mohawk again offered explanations for the Company's rising inventory and slowing turnover, with

defendant Landau representing that "[i]nventories ended the quarter at $2.3 billion or 126 days . . . due to the ramp up of new plants, acquisitions and higher raw material costs."

149.   During the First Quarter 2019 Investor Call, defendant Lorberbaum also misleadingly claimed that the Company's rising inventories were attributable to the "new plants that required inventories to support them, the acquisitions that we did last year, the inventory flowing in" and "tariffs."  Specifically, in response to an analyst's question whether Mohawk had "right-sized the business," defendant Lorberbaum stated as follows:

> The inventory levels were up in the period.  But almost all the inventory increase was up due to new plants that required inventories to support them, the acquisitions that we did last year, the inventory flowing in. And then with the tariffs that were expected, the products we're importing from China will dramatically increase the inventories in the period. For the most part – most of our inventories in the ongoing businesses were kept under control with lower production rates.

150.   Defendants' statements identified in paragraphs 148 and 149 were false, misleading, and omitted material facts for the reasons set forth in paragraph 72(c).

## F.   The Truth Is Gradually Revealed

151.   Mohawk could not conceal forever the true reasons for its reported record-breaking quarterly sales and margins, rising inventory, and slowing turnover.

The truth came out gradually through a series of disclosures, each of which revealing new information related to its false statements.

152.   The truth began to emerge on July 2, 2018, when the Company announced that "[o]ur results fell short of our expectations, and we are taking actions to improve the performance of our U.S. businesses."  Specifically, after a string of record quarterly profits and meeting or beating Company guidance and analysts' expectations, the Company revealed a substantial EPS miss from its own guidance and consensus estimates, which the Company attributed, in part, to "lower sales than we anticipated."  It also revealed that margins were "down."

153.   Mohawk reported EPS of $3.51, way below the Company's guidance ($3.89-3.98) and analysts' consensus estimate ($3.90).  Mohawk also substantially lowered its guidance for third quarter 2018 EPS to $3.54-3.64, almost 20% lower than analysts' consensus estimates of $4.28.

154.   The Company also revealed that, contrary to its prior representations that it was selling out of product and was capacity constrained, the Company's warehouses were full of excess inventory, requiring Mohawk to begin to "produce[] less than [it] sold to reduce inventory."  It also disclosed, for the first time, significant manufacturing issues, including "manufacturing shutdowns," a "lower production rate," and "new product inefficiencies," in Flooring North America.   Finally,

Lorberbaum also revealed that Mohawk was required to increase sourcing of LVT from outside of the U.S.

155.    Following the Company's July 26, 2018 disclosures, Mohawk's stock price fell by 18%—a decline of $38.06 per share—erasing $2.8 billion in shareholder value in a single trading day.

156.    On October 26, 2018, Mohawk disclosed that the issues partially disclosed in the second quarter had persisted.  On that quarter's conference call, Lorberbaum stated that "[s]ales growth in all segments was lower than our estimates" and that "[a]dditional manufacturing reductions were required during the [quarter] to control inventory."  Lorberbaum further provided damning details about the Company's struggle to produce LVT product in the U.S. LVT Plant, including "physical mechanical failures" and "software problems."

157.    Lorberbaum also revealed a significant step down in margins for Flooring North America, with operating margin falling to single digits, which the Company attributed in part to "lower than expected production."  Along with these revelations, the Company once again announced much lower EPS guidance for the fourth quarter of 2018.  It provided fourth quarter EPS guidance of $2.45 to $2.60, much lower than analysts' consensus expectation of $3.51 EPS.

158.   Mohawk's stock price again dropped precipitously following the Company's revelations on October 26, 2018.  Indeed, within less than twenty-four hours, Mohawk's stock price toppled an additional 24%, a drop of $36.04 per share, erasing $2.6 billion more in shareholder value.

159.   On July 26, 2019, the Company disclosed that, contrary to the Company's recent assurances, its difficulties reducing inventory were far from over, and that it still had excess inventories that necessitated it "taking actions" to "manage our inventory" and "improve sales," especially in Flooring North America, which had a 7% year-over-year decline in sales and more than a 4% year-over-year decline in operating margin.  The Company also finally revealed that the inventory issues and lower sales volume were expected to continue, slashing third quarter guidance and noting that the guidance accounted for "excess inventories" and "reduced production," as well as "lower volume and margins" and "increased competition." The Company further admitted that "most of the benefit of the different actions" the Company was taking would not be seen until the following year.

160.   Mohawk's stock price again dropped precipitously following these disclosures, falling another 18%, a decline of $27.52 per share, and erasing nearly $2 billion in shareholder value.

161.   On January 3, 2020, investors filed the Securities Class Action.  And, on June 29, 2020, the Court-appointed lead plaintiff filed a Consolidated Class Action Complaint.

162.   On news of the new, detailed allegations in the Securities Class Action, Mohawk's stock price dropped from a close of $91.39 per share on July 8, 2020 to $73.12 per share the following day, wiping out another $1.3 billion in market capitalization.

163.   On July 8, 2020, Deutsche Bank issued an analyst report describing some of the accounting scheme allegations made by a number of former high-level Mohawk employees in the Consolidated Class Action Complaint.  This was followed the next day by a similar analyst report by Wells Fargo.

164.   On July 13, 2020, Mohawk filed a Current Report on Form 8-K with the SEC, which stated in part:

> On June 25, 2020, the company received subpoenas issued by the U.S. Attorney's Office for the Northern District of Georgia and the U.S. Securities and Exchange Commission on topics similar to those raised by the [Consolidated Class Action Complaint]. The company is cooperating with those authorities.

165.   On this news, Mohawk's stock price dropped another $2.39 per share on July 14, 2020, erasing an additional $170 million in shareholder value.

166.   All told, as the truth gradually made its way into the marketplace through a series of partial disclosures, Mohawk lost nearly $9 billion in market capitalization.

## V.   DAMAGES/HARM TO MOHAWK

167.   As a direct and proximate result of Defendants' misconduct, Mohawk has suffered and continues to suffer significant harm, including but not limited to:

   A.   The loss of credibility associated with Mohawk's dissemination of improper public statements concerning its business, operations, and prospects, and the Company's associated loss of approximately $9 billion in market capitalization as the misconduct came to light;

   B.   Legal and other costs incurred, and the distraction of, investigating and defending Mohawk and defendant Lorberbaum in the Securities Class Action, as well as potentially hundreds of millions of dollars in damages in connection with any settlement of or judgment in the Securities Class Action or any related litigation;

C.     Costs incurred in connection with the Company's repurchases of its common stock at artificially inflated prices as a result of the material misstatements and omissions detailed herein;

D.     Legal and other costs incurred, and the distraction of, responding to subpoenas issued by the SEC and the U.S. Attorney's Office for the Northern District of Georgia;

E.     Costs associated with Mohawk's Scrap LVT inventory and excess inventory as the result of unnecessarily long production runs;

F.     Harm to Mohawk's corporate image and goodwill.  For the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stock of companies which have been implicated in misleading the investing public, such that Mohawk's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company will incur higher marginal costs of capital and debt because of the misconduct;

G.     Amounts paid to defendant Carson and others after being terminated for misconduct; and

H.   Costs incurred from compensation and benefits paid to Defendants and other members of Mohawk's management while they were engaged in the improper conduct alleged herein, which compensation was based in part on the Company's artificially inflated stock price.

## VI.   DEFENDANTS' DUTIES

### A.   Defendants' Fiduciary Duties

168.   By reason of their positions as officers and/or directors of Mohawk and because of their responsibility to control the business and corporate affairs of the Company, Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

169.   Because of their positions of control and authority as officers and/or directors of Mohawk, Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their

advisory, executive, managerial, and directorial positions with Mohawk, each Defendant had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

170.   At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Mohawk and was at all relevant times acting within the course and scope of such agency.

171.   To discharge their duties, Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Mohawk.  By virtue of such duties, Defendants were, and are, required to, among other things:

a. exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

b.      neither violate nor knowingly permit any officer, director, or employee of Mohawk to violate any applicable laws, rules, or regulations;

c.      remain informed as to the status of Mohawk's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

d.      establish and maintain systematic and accurate records and reports of the business and affairs of Mohawk and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.      maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Mohawk are conducted in accordance with all applicable laws, rules, and regulations; and

f.      truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.     Duties Pursuant to the Company's Corporate Governance Guidelines**

172.    The      Company's      Corporate      Governance      Guidelines ("Governance Guidelines") were adopted by the Board to form the framework for governance of the Company.  These guidelines apply to the Director Defendants in connection with their membership on Mohawk's Board.

173.    According to Mohawk's Governance Guidelines, the Board's mission is as follows:

> The Mohawk Board of Directors represents the stockholders' interests in perpetuating and increasing the value of the business enterprise, including optimizing long-term financial returns.  The Board is responsible for ensuring that management is capably executing its duties by regularly monitoring the effectiveness of management policies and decisions, including the execution of the Company's strategic plan.

> In fulfilling its obligation to enhance stockholder value, the Board is permitted to consider the interests of the following constituencies important to Mohawk's success: Mohawk's customers, employees, suppliers and the communities where it operates.

> In fulfilling the Board's general responsibilities described above, the Board and its committees have complete authority to consult with outside counsel and to engage other professional advisors with respect to any issues relating to their activities.  Any expenses incurred by the Board or its committees in connection with any such consultation or engagement shall be paid by Mohawk.

### C.    Duties Pursuant to the Company's Standards of Conduct

174.   Defendants were also bound by the Company's Standards of Conduct and Ethics for Employees, Officers and Directors of Mohawk Industries, Inc. ("Standards of Conduct").

175.   Among other things, the "Purpose" section of the Standards of Conduct states, in part: "Integrity and a high standard of ethics are fundamental to our beliefs. Mohawk is committed to doing what is right and deterring wrongdoing, and we expect you to uphold these beliefs, as well."

176.   The "Fair and Honest Dealing" section of the Standards of Conduct states, in part: "You must deal fairly and honestly with Mohawk's employees, shareholders, customers, suppliers and competitors.  You must behave in an ethical manner and not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair business practice."

177.   The "Integrity of Records and Compliance with Accounting Principles" section of the Standards of Conduct states:

> Mohawk and the law require the preparation and maintenance of accurate and reliable business records.  You must prepare all reports, books and records of Mohawk with care and honesty.  Mohawk maintains a system of internal controls to ensure that transactions are carried out in accordance with management's authorization and properly recorded.  This system includes policies, procedures and

examination by a professional staff of internal auditors. Mohawk expects you to adhere to these policies and procedures.

You should make all complaints regarding accounting, internal accounting controls, or auditing matters to the Vice President-Internal Audit, who will assess each complaint. If the complaint requires follow up action, the Vice President -Internal Audit will document, file and, if material, communicate the results to the Audit Committee quarterly or sooner. The Vice President-Internal Audit will record each of these complaints, retain them in a log for at least five (5) years and make available for review by the Audit Committee.

You may submit a confidential, anonymous memo that explains your concerns or complaints regarding questionable accounting or auditing matters to the Vice President -Internal Audit. The Vice President -Internal Audit will handle these complaints consistently with other complaints

178. The Supplemental Standards for Senior Financial Officers section of the Standards of Conduct, which applies to Mohawk's "President and Chief Executive Officer, the Chief Financial Officer and the Corporate Controller" states, in part:

**Integrity and Accuracy of Public Disclosures**

Mohawk's principal executive officer and senior financial officers must take all reasonable steps to ensure that the disclosures in the reports and documents that Mohawk files with or submits to the Securities and Exchange Commission and in other public communications are full, fair, accurate, timely and understandable. In the event that the principal executive officer or a senior financial officer learns that any such report, document or communication does not meet this standard and the deviation is material, then such officer will review and investigate the deviation, advise the [Board] or the appropriate

Board committee and, where necessary, revise the relevant report, document or communication.

**Accounting Treatment**

Although a particular accounting treatment for one or more of Mohawk's operations may be permitted under applicable accounting standards, the principal executive officer and senior financial officers will not authorize or permit the use of such an accounting treatment if the effect is to distort or conceal Mohawk's true financial condition.

## D.     Additional Duties of the Audit Committee Defendants

179.   In addition to the duties discussed above, the Audit Committee Defendants owed specific duties to Mohawk under the Audit Committee Charter ("Audit Charter").  According to the Audit Charter, the Audit Committee's purpose is as follows:

The Audit Committee (the "Committee") is appointed by the [Board] to assist the Board in fulfilling its oversight responsibilities.  The Committee shall monitor (a) the integrity of the Company's publicly reported financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditors' qualifications and independence, and (d) the performance of the Company's internal audit function and independent auditors.  In furtherance of this purpose, the Committee shall maintain direct communication among the Company's independent auditors and VP - Internal Audit and the Board of Directors.  In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company.  The Committee has the authority to retain at Company expense outside legal, accounting or other advisors to advise the Committee and to determine and recommend funding for payment of ordinary administrative expenses necessary and appropriate in carrying out the Committee's duties.  The Committee shall produce

an annual report for inclusion in the Company's proxy statement for the annual meeting of stockholders, in accordance with applicable rules and regulations.

The Committee's job is one of oversight and it recognizes that the Company's management is responsible for preparing the Company's financial statements and that the outside auditors are responsible for auditing those financial statements. Additionally, the Committee recognizes that financial management, as well as the independent auditors, have more time, knowledge and more detailed information about the Company than do Committee members; consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditors' work.

180.    Among other things, the Audit Charter charges the Audit Committee

Defendants with the following authority and responsibilities, among others:

(a) At least annually, review and reassess the adequacy of this [Audit Charter] and evaluate the performance of the Committee and report the results thereof to the [Board].

(b) Study and make recommendations to the [Board] with respect to audit policies and procedures and the scope and extent of audits. In consultation with corporate management, the independent auditors, and the internal auditors, consider the integrity of the Company's financial reporting processes and controls. Discuss significant financial and other risk exposures and the steps corporate management has taken to monitor, control, and report such exposures.

(c) Review the qualifications, independence and performance of the independent auditors including the lead partner of the independent auditor, and present its conclusions to the [Board] annually in advance of the annual meeting of stockholders. As part of such annual review, obtain and review a report by the independent auditors describing: all relationships between the independent

auditors and the Company, the independent auditors' internal quality-control procedures, any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues. Discuss with the independent auditors all significant relationships they have with the Company that could impair the auditors' independence. Discuss with corporate management and personnel responsible for Mohawk's internal audit function the qualifications, independence and performance of the independent auditors. The independent auditors shall report directly to the Committee and are ultimately accountable to the Committee and the [Board].

(d) Retain and terminate the Company's independent auditors, with sole authority to pre-approve, to the extent required by applicable law, all audit and non-audit engagements and the related fees and terms with the independent auditors. In accordance with applicable law, the Committee may delegate this authority to one or more designated members of the Committee; provided that any such decision made pursuant to the foregoing delegation of authority shall be presented to the Committee at its next regularly-scheduled meeting.

(e) Satisfy itself as to the professional competency of the VP - Internal Audit and the adequacy of his/her staff in discharging responsibility of the office. Review with management the appointment and replacement of the VP - Internal Audit.

(f) Review with the independent auditors and with the VP - Internal Audit, at a time when the annual audit plan is being developed, the plan's timing, scope, staffing, locations, foreseeable issues, priorities and procedures, the coordination between the independent auditors and the VP - Internal Audit in executing the plan and the engagement team.

(g) Meet separately, periodically, with corporate management, the VP - Internal Audit and the independent auditors.

(h) Review annually the Company's internal auditing program and significant reports with the VP - Internal Audit and corporate management's response and follow-up to those reports.

(i) Meet quarterly with corporate management and with the independent auditors, to discuss the annual audited financial statements, including footnotes, the unaudited quarterly financial results prior to the release of earnings and/or the quarterly financial statements prior to filing or distribution, including, in each case, a review of the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations".  In discharging this obligation, receive and review, if necessary, a report from the controller as to any unusual deviations from prior practice that were included in the preparation of the annual or quarterly financial results.  Review and discuss (1) draft press releases of unaudited interim and annual financial results before public release and (2) financial information and earnings guidance provided to analysts and ratings agencies.  Press releases and interim financial statements also will be reviewed by the independent auditors prior to public release.

(j) Review the report to the Committee from the Company's independent auditors in accordance with Section 204 of the Sarbanes-Oxley Act of 2002.  Review the contents of such report and all major accounting policy matters involved in the preparation of interim and annual financial reports with corporate management and any deviations from prior practice with the independent auditors.

(k) Review with the independent auditors, on completion of the annual audit, their experience, any difficulties encountered, any restrictions on their work, cooperation received, significant disagreements with corporate management, their findings and their recommendations. Discuss certain matters required to be communicated to audit committees in accordance with AICPA SAS 61.

(l) Review the application of significant regulatory, accounting and auditing policies, including new pronouncements, to the Company's financial reports.

(m) Analyze financial reports to understand performance fluctuations between reporting periods and between reports and plan.

(n) Review and assess the adequacy of internal accounting procedures and controls, including a review with the independent auditors of their evaluation of the Company's internal controls. Review quarterly the programs that the Company has instituted to correct any control deficiencies noted by the VP - Internal Audit in the periodic review or the independent auditors in their annual review. Discuss with management the results of the foregoing reviews, including significant items and potential ways to improve the accounting procedures and controls.

(o) Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

(p) Establish clear hiring policies for current or former employees of the independent auditors.

(q) Report annually to the [Board], after the close of each fiscal year but prior to the Company's annual meeting of stockholders, as well as on any other occasion, any issues that arise with respect to the quality or integrity of the Company's publicly reported financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the performance of the internal audit function, or whatever it deems appropriate concerning the activities of the Committee.

(r) Perform any other activities consistent with this Charter, the Company's bylaws, and governing law as the Committee or the Board deems necessary or appropriate.

## VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

181.   In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.   In addition to the wrongful conduct alleged herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

182.   During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things: (a) deceive the investing public including stockholders of Mohawk; and (b) permit flawed and ineffectual internal controls over the Company's operations.   In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

183.   Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   During this time, Defendants caused and/or allowed the improper conduct described herein.

184.   The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate

assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

185.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein.  Because Defendants' actions occurred under the authority of the Board, each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

186.   Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   DERIVATIVE ALLEGATIONS

187.   Plaintiff brings this action derivatively in his own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Mohawk as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by Defendants.

188.   Mohawk is named as the Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

190.   Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

## IX.   FUTILITY ALLEGATIONS

191.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

192.   Mohawk's current Board consists of eight members: defendants Lorberbaum, Bogart, Balcaen, Bruckmann, Onorato, Runge, Wellborn, and Non-Party John M. Engquist (the "Demand Board").  Plaintiff has not made any demand on the Demand Board to institute this action because such a demand would be a futile and useless act.

### A.   Demand Is Excused as to Defendants Lorberbaum and Wellborn Because They Lack Independence

193.   Defendant Lorberbaum falls under the NYSE's "bright-line" independence disqualification.   According to the NYSE's Listing Standards, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company.   Because defendant Lorberbaum is Mohawk's current CEO, he may not be considered independent.   The Company's 2020 Proxy Statement indicates that defendant Lorberbaum is not "independent" as defined by the NYSE listing standards, SEC Rules, and Mohawk's Corporate Governance Guidelines.

194.   Defendant Wellborn also falls under the NYSE's "bright-line" independence disqualification.   Because defendant Wellborn is Mohawk's current COO, he may not be considered independent.   The Company's 2020 Proxy Statement indicates that defendant Wellborn is not "independent" as defined by the NYSE listing standards, SEC Rules, and Mohawk's Corporate Governance Guidelines.

195.   Furthermore, defendants Lorberbaum and Wellborn are not independent because their principal professional occupations are their employment with Mohawk.

196.   As CEO beginning in 2001, defendant Lorberbaum received significant compensation from the Company as described herein.  As COO beginning in 2005 and President and COO since 2009, defendant Wellborn received significant compensation from the Company as described herein.

197.   Accordingly, defendants Lorberbaum and Wellborn lack independence from the other members of the Demand Board due to their interest in maintaining their executive positions.  This lack of independence renders defendants Lorberbaum and Wellborn incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.      Demand Is Excused Because Defendants Lorberbaum, Bogart, Balcaen, Bruckmann, Onorato, Runge, and Wellborn Face a Substantial Likelihood of Liability for Their Misconduct**

198.   Seven of the eight members of the Demand Board, defendants Lorberbaum, Bogart, Balcaen, Bruckmann, Onorato, Runge, and Wellborn, breached their fiduciary duties by, among other things:

    (a)      failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

75

(b)     themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Mohawk's financial results as well as its business, operations, and future prospects.   Each of these directors signed the Company's materially false and misleading 2017 10-K and 2018 10-K.

(c)     failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(d)     causing the Company to repurchase more than $443 million in Mohawk shares at prices artificially inflated by their misconduct;

(e)     awarding Mohawk's senior executives lavish compensation packages (including giving defendant Carson a $1 million severance payment) despite their responsibility for the Company's willful misconduct; and/or

(f)     reappointing the same directors who had failed in their duties to the Audit Committee beginning at the latest in 2017 and continuing to this day.

199.   Defendant Lorberbaum is named as a defendant in the related Securities Class Action which alleges that he violated §§ 10(b) and 20(a) of the Exchange Act by affirmatively making false and misleading statements and/or controlling Mohawk and its § 10(b) violations.  These federal securities violations also constitute breaches of defendant Lorberbaum's fiduciary duties.

200.   Accordingly, defendants Lorberbaum, Bogart, Balcaen, Bruckmann, Onorato, Runge, and Wellborn face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

201.   Three of the eight members of the Demand Board, defendants Bruckmann, Onorato, and Runge, as members of the Audit Committee at relevant times, had specifically-defined duties to properly oversee (a) the integrity of the Company's publicly reported financial statements, press releases, and guidance, (b) its system of internal, financial and administrative controls, (c) the Company's compliance with legal and regulatory requirements, and (d) the performance of the Company's internal audit function and independent auditors.  Moreover, they were specifically tasked with analyzing the Company's financial reports to understand performance fluctuations between reporting periods and between reports and plan. Thus, defendants Bruckmann, Onorato, and Runge were responsible for knowingly

or recklessly allowing and failing to correct the improper conduct and public statements detailed herein.

202.   While all Audit Committee members must be "financially literate" in accordance with SEC requirements and NYSE listing standards, defendant Onorato was designated by the Company as meeting the requirements of "Audit Committee Financial Expert" as defined by SEC and NYSE regulations and rules.   This designation means, among other things, that the "expert" has all of the following attributes: (a) an understanding of GAAP and financial statements; (b) an ability to assess the general application of such principles in connection with the accounting for estimates, accruals, and reserves; (c) experience preparing, auditing, analyzing, or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or  experience actively supervising one or more persons engaged in such activities; (d) an understanding of internal controls and procedures for financial reporting; and (e) an understanding of audit committee functions.  Because all Audit Committee members were financial experts and/or financially literate, they had a heightened obligation to understand the accounting matters at issue and prevent any and all improper conduct associated therewith.

203.  For these reasons, defendants Bruckmann, Onorato, and Runge face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

### C.   Demand Is Excused For Additional Reasons

204.  Demand is futile because the Board is dominated and controlled by defendant Lorberbaum because Mohawk is a family operated company.  Defendant Lorberbaum built Mohawk into the largest flooring company in the world and has a 26% stake in the Company.  His father Alan Lorberbaum founded Aladdin Mills Inc. ("Aladdin") in 1957 as a maker of bathmats and defendant Lorberbaum joined the company in 1976 and later became CEO.  In 1994, the Lorberbaum family sold Aladdin to Mohawk ("Aladdin Merger") and defendant Lorberbaum took charge of Mohawk in 2001 and expanded into hard-surface flooring.  Defendant Lorberbaum's son, Brian Lorberbaum, is an employee in the Company and is likely being groomed for a leadership position at the Company.

205.  The 2020 Proxy further reflects the control the Lorberbaum family has over the Company.  For instance, the 2020 Proxy describes "Contractual Obligations with respect to the Election of Directors" explaining that in connection with the Aladdin Merger, the Company is allowed to nominate up to two persons to the Board and defendant Lorberbaum is one of those designees.

206.   Any suit by the Demand Board to remedy these wrongs would also expose Nominal Defendant Mohawk to liability for violations of the federal securities laws in the pending Securities Class Action and would potentially result in civil actions being filed against one or more of the Officer Defendants or Director Defendants.  If the Board elects for the Company to press forward with its rights of action in this case, then Mohawk's efforts would compromise its own defense of the Securities Class Action.

207.   Defendants Bogart, Balcaen, Bruckmann, Onorato, and Runge are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants.   Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Mohawk's name would necessarily expose the Board's own culpability for the very same conduct.   In other words, given that the Board was required to be regularly informed concerning the Company's public reporting, outlook, controls, and employment decisions with respect to the Company's most senior officers, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Board.

208.   Moreover, the acts complained of constitute violations of the fiduciary duties owed by Mohawk's officers and directors, and these acts are incapable of ratification.  Despite having knowledge of the claims and causes of action raised by Plaintiff, the Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiff herein.

209.   Defendants Bogart, Onorato, and Runge serve together on the Compensation Committee.  These individuals set at least portions of their own compensation, as well as the compensation of their colleagues on the Demand Board. Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a stockholder demand to investigate or prosecute an action pertaining to Defendants' improper conduct.

## X.    CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

210.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

211.   The Officer Defendants owed fiduciary duties to Mohawk and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer

Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Standards of Conduct, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

212.   The Officer Defendants violated these duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.  The Officer Defendants were well aware of the relevant disclosure laws, rules, and regulations.

213.   The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

> (a)   Affirmatively and repeatedly making and/or failing to correct improper statements in press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Mohawk's financial results as well as its business, operations, and future prospects;

(b)     Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(c)     Failing to implement and maintain adequate internal controls; and/or

(d)     Causing the Company to repurchase more than $443 million in Mohawk shares at prices artificially inflated by their misconduct.

214.   Defendants Lorberbaum and Boykin breached their duty of loyalty by selling Mohawk stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, adverse nonpublic information concerning the Company's financial results and prospects.  It was an asset belonging to the Company, which defendants Lorberbaum and Boykin used for their own benefit when they sold Mohawk stock.

215.   As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Mohawk has sustained significant damages. Accordingly, the Officer Defendants are liable to the Company.

216.   Plaintiff, on behalf of Mohawk, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Director Defendants)

217.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

218.   The Director Defendants owed and owe Mohawk fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Mohawk the highest obligation of good faith, fair dealing, loyalty and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal securities laws, rules and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

219.   The Director Defendants also owed and owe Mohawk fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.  The Director Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

220.   In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its

Governance Guidelines, Standards of Conduct, and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

221.   Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

222.   The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)   Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(b)   Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Mohawk's financial results as well as its business, operations, and prospects;

(c)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(d)    Awarding Mohawk's senior executives lavish compensation packages, and paying defendant Carson a $1 million severance, despite their responsibility for the Company's willful misconduct;

(e)    Causing the Company to repurchase more than $443 million in Mohawk shares at prices artificially inflated by their misconduct; and/or

(f)    Reappointing the same directors who had failed in their duties to the Audit Committee beginning at the latest in 2017 and continuing to this day.

223.   As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Mohawk has sustained significant damages. Accordingly, the Director Defendants are liable to the Company.

224.   Plaintiff, on behalf of Mohawk, has no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets
### (Against All Defendants)

225.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226.   As a result of the misconduct described above, Defendants have wasted corporate assets by forcing the Company to expend valuable resources repurchasing its own shares at artificially inflated prices, as well as by forcing the Company to pay the improper, unnecessary and unjustified compensation, severance, and other awards and benefits to the Defendants.

227.   Additionally, as a result of Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Mohawk is subject to the Securities Class Action.  Defendants have caused Mohawk to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

228.   As a result of their waste of corporate assets, Defendants are liable to the Company.

229.   Plaintiff, on behalf of Mohawk, has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment
### (Against All Defendants)

230.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

231.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Mohawk.  Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.  In additionally, defendant Carson was unjustly enriched in the amount of his $1 million severance.

232.   Plaintiff, as a stockholder and representative of Mohawk, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, severance payments, and other compensation obtained by Defendants, and each of them, in connection with, from or at the time of their wrongful conduct and fiduciary breaches.

233.   Plaintiff, on behalf of Mohawk, has no adequate remedy at law.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Finding that a stockholder demand on the Mohawk Board would have been a futile and useless act;

B.     Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, and were unjustly enriched;

C.     Directing Mohawk to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting and other internal controls;

- a proposal to declassify the Board;

- a proposal to require an independent Chair of the Board and separation of the roles of Chair of the Board and CEO;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

- a provision to permit the stockholders of Mohawk to nominate three candidates for election to the Board.

D.      Against each Defendant in favor of Mohawk for the amount of damages sustained by Mohawk, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring Defendants to return to Mohawk all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

F.      Requiring Defendants Lorberbaum and Boykin to disgorge all profits realized through their sales of Mohawk stock at artificially inflated prices while in possession of material, adverse nonpublic information and requiring that such profits be held in constructive trust for the Company's benefit;

G.      Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Mohawk's directors, officers, and employees do not engage in wrongful or illegal practices;

H.      Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

I.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

J.      Granting such other and further relief as this Court deems just and equitable.

## XII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  August 6, 2020                          **JOHNSON FISTEL, LLP**

                                        By:   */s/ Michael I. Fistel, Jr.*_____
                                            MICHAEL I. FISTEL, JR.
                                            michaelf@johnsonfistel.com
                                            Georgia Bar No. 262062
                                            WILLIAM W. STONE
                                            williams@johsonfistel.com
                                            Georgia Bar No. 273907
                                            OLIVER TUM SUDEN
                                            olivert@johnsonfistel.com
                                            Georgia Bar No. 226685
                                            40 Powder Springs Street
                                            Marietta, GA 30064
                                            Telephone: (470) 632-6000
                                            Facsimile: (770) 200-3101

                                            *Attorneys for Plaintiff*

# **VERIFICATION**

I, JOE THARAYIL, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 5th  of August, 2020

_____
JOE THARAYIL